IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>      Plaintiff,<br><br><br><br><br>                  vs.<br><br><br>  NICHOLAS PECK, et al.,<br><br>      Defendants. | MEMORANDUM DECISION AND ORDER DENYING MOTION TO SUPPRESS<br><br><br><br><br><br>Case No. 2:07-CR-173 TS |

This matter is before the Court on Defendant Guerrero's Motion to Suppress.[1]  The Court

held an evidentiary hearing on February 1, 2008, and post-hearing briefing was complete on May

9, 2008.[2]  The Court has reviewed the entire record and finds that the officers obtained valid

consent to enter the residence and search the garage.  Further, Defendant was properly informed

of his rights prior to making the statements that he now seeks to suppress.  Therefore, the Motion

to Suppress is denied.

---

[1]Docket No. 110.

[2]The first round of post-hearing briefing was complete on April 21, 2008, however, on May 7, 2008, the government filed a response to Defendant's reply brief.  On May 9, 2008, Defendant filed a motion to strike and, in the alternative, a sur-reply.  The government stipulated to the acceptance of the sur-reply on May 13, 2008.  The Court considered all filings in deciding this Motion to Suppress.

I.      Findings of Fact

On August 5, 2005, at approximately 2:00 a.m., Officer Koval received a suspicious persons call at 7200 Pirates Cove in Las Vegas.  The caller described two people, a bald Hispanic male with a white t-shirt and a white male in his early twenties, six feet tall, with a shaved head and white t-shirt.

Officer Yant responded to the Pirates Cove address in his own vehicle.  He was informed that the two subjects were observed taking a wheel rim off an unspecified vehicle and leaving the complex.  Officer Yant found two stolen vehicles in the area but did not see anyone matching the caller's description.

Shortly after the Pirates Cove call, Officer Koval received another call from 8404 Mulcahy, approximately a mile and a half from Pirates Cove.  The caller complained of three younger Hispanic or white males who were nearby, perhaps stripping a vehicle.  Officer Koval diverted to the Mulcahy address, believing that the two calls were related.  Officer Koval testified at the hearing that he believed that the suspects arrived at Pirates Cove, abandoned a stolen car, stole another car, and proceeded to 8404 Mulcahy.

Prior to Officer Koval's arrival at Mulcahy, a helicopter air unit flew over the house and determined that no one was outside at the time.  Upon arriving in the neighborhood, Officer Koval turned off his lights and drove past the house.  He did not observe anyone outside at 8341 Mulcahy, but did observe someone outside three or four houses down the street.  This neighbor was the caller who had complained of the three men possibly stripping a vehicle.  The caller told Officer Koval that several expensive SUVs, such as Cadillac Escalades and Lincoln Navigators, had gone to and from the house and that the previous day, an Escalade had gone to 8341 Mulcahy and a frame had been towed out later in the day.  Officer Motl arrived at 8341 Mulcahy

2

and several other neighbors came out to talk to the two officers, reporting that a U-Haul had also arrived the previous day and left with a number of auto parts.  The neighbors indicated that this happened regularly at this residence.  The neighbors also stated that three men had been outside, but had gone inside quickly when the helicopter air unit flew over the house.

Officer Koval ran a search on the car parked in front of 8341 Mulcahy and determined that it was not stolen.  He determined to investigate the complaints of the neighbors and his suspicions that 8341 Mulcahy was a "chop shop" by performing a "knock and talk" at 8341 Mulcahy.  At the evidentiary hearing, Officer Koval stated that a "knock and talk" involves making contact with the residents of a home, identifying the occupants of the home and attempting to further investigate the complaints of the neighbors.  Officer Koval did not obtain a search warrant prior to knocking on the door at 8341 Mulcahy.

At approximately 2:40 or 2:50 a.m., Officers Koval and Motl knocked on the door and rang the doorbell.  Both officers were in uniform and armed.  A woman, Ms. Gina Flores, answered the door and, in response to the officers' questions, stated that her child and three men were also in the house with her.  Officer Koval told Ms. Flores to get the men because he needed to talk to them.  Ms. Flores stated, "That's fine," and opened the door.  She did not invite the officers in and she did not ask the officers to wait outside.  Officer Koval followed Ms. Flores through the entryway into the kitchen, while Officer Motl waited outside.

Officer Koval testified that while he did not feel threatened, there is an inherent level of risk associated with suspects of a possible felony violation, and that he positioned himself in the kitchen so as to have a clear view of the three bedroom doors in the house.

Ms. Flores called out that the police were there and Officer Koval stated, "Metro police, you need to come out here and talk to us."  Two men exited one of the bedrooms - a bald,

3

Hispanic male wearing a white t-shirt and a white male with a shaved head, wearing no shirt - and a third came from another bedroom.  One of the men was the defendant, John Guerrero.  One of the other men was Defendant's brother, Javier Guerrero.  The third man was Johnny Carranza. Officer Koval testified that none of the occupants of the home appeared sleepy.  He also testified that he believed that two of the men generally fit the description of the men from Pirates Cove - a bald Hispanic male with a white t-shirt and a white male in his early twenties, six feet tall, with a shaved head and white t-shirt.  Officer Koval also testified that he believed that this residence may be a chop shop or at least a storage location for stolen auto parts.

Officer Koval asked the three men to step outside to Officer Motl, while he performed a protective sweep of the home.  Ms. Flores was also asked to stand near Officer Motl in the doorway, but to stay inside the house.  All four complied with the officer's directions while Officer Koval conducted a sweep of the home to ensure there were no other occupants.  Officer Koval testified that a sweep of this nature is part of standard procedure in a situation involving a possible felony or violent misdemeanor.  He also testified that he looked in closets, under beds, in all the bedrooms and bathrooms and in the garage - anywhere a person could conceivably hide. In the garage, he observed a large amount of auto parts, including car doors, front dashboard assemblies, radios and other electronics.  The car doors appeared to be from either an Escalade or Navigator.  The entire sweep took about two minutes.

Officer Koval notified Officer Motl as to what he discovered in the garage and asked Officer Motl to obtain identifications for the three men.  No one was formally arrested, but Officer Koval gave all three men their *Miranda* rights at about 3:16 a.m.  Ms. Flores was not read her *Miranda* rights.

In response to Officer Koval's questions, Defendant indicated that he purchased all the

parts in the garage from his friend Eddie for $600.  Defendant stated that Eddie salvages the parts
from wrecked vehicles.  Officer Koval suspected that Defendant was lying because a single door
for an Escalade is approximately $500 and Defendant did not provide any of Eddie's contact
information, though Defendant claimed to have a business relationship with him.

After speaking with Defendant, Officer Koval went back inside and asked Ms. Flores if
she knew anything about the auto parts in the garage.  She stated that she did not, but gave verbal
consent to search the garage.  She walked with Officer Koval to the door adjoining the garage,
opened it and turned on the garage light.  The officer attempted to obtain VIN numbers from the
auto parts, but found that the identifying stickers and other markings had been removed.  Officer
Koval contacted his department's auto-theft unit, VIPER, and informed them of the situation.
The VIPER contact instructed Officer Koval to keep control of the situation and that unit
detectives were being dispatched to the house.  While waiting for the VIPER detectives, Officer
Koval further interviewed the three men.  Officer Koval testified that at this point, Defendant was
no longer free to leave the scene.

At about 4 a.m., Detective Nathan Chio of the VIPER unit responded to the Mulcahy
residence, along with two other officers and an insurance agent.  They did not have a search
warrant.  Detective Chio was familiar with Defendant from a previous incident earlier in 2005,
when Chio arrested Defendant for conspiracy to sell stolen vehicles.  Detective Chio believed
that either Defendant or his girlfriend lived in the home.

Officer Koval briefed Detective Chio on the night's events and told Chio that he had
obtained verbal consent to search the garage from Ms. Flores.  On a quick walk through the
garage, Detective Chio observed numerous vehicle parts.  Officer Koval then asked Ms. Flores to
sign a written consent-to-search form that listed the auto parts in the garage as the subject of the

search, but did not have an address or specific location in the house to be searched.  Detective

Chio told Ms. Flores that he was only interested in the contents of the garage.  Prior to signing

the form, Ms. Flores told Officer Koval that she and her child lived at the residence, and

provided him with mail and a citation listing the address as her residence for support.  Officer

Koval signed the form as a witness to Ms. Flores' signature.

Upon further search of the garage, Detective Chio verified that the VIN labels had been

removed from the auto parts.  He also discovered an ATV, which was later determined to have

been reported stolen.

At about 5 a.m., Defendant signed and initialed a form acknowledging his *Miranda*

rights.  He wrote what he told Officer Koval regarding Eddie and the origin of the auto parts.

Detective Chio took Defendant across the street and talked to him for about 20 or 25 minutes

about Detective Chio's ongoing investigation of an auto-theft operation.  Defendant

acknowledged that he knew the individuals that Detective Chio was investigating, but did not

provide any information about them.  Defendant also stated that the ATV had been dropped off

by a friend.  Defendant could not give his friend's last name, address or phone number.

Detective Chio advised Defendant to think about the other occupants of the house, particularly

Defendant's girlfriend and brother.  He also indicated that they would be charged if the parts

were stolen.  Defendant told Officer Chio "you know what's going on, my girl doesn't know

anything about it."  At the hearing, Detective Chio testified that the main point of his

conversation with Defendant was to obtain his help in pursuing the main targets of the auto theft

operation and that he gave his card to Defendant, with an offer to help mitigate charges against

Defendant if he cooperated in the larger investigation.

During Detective Chio's conversation with Defendant, two other officers were in the

garage, looking through the auto parts.  The officers did not ask Defendant, Defendant's brother or Mr. Carranza for permission to search.  Defendant was not arrested that morning.

III.    Discussion

Defendant makes five arguments in support of his motion to suppress, 1) that the initial entry of Officer Koval into the home was unlawful because Ms. Flores did not give consent and Officer Koval did not have a warrant; 2) that Detective Koval's first search of the home is not properly characterized as a protective sweep and is therefore unlawful; 3) that the initial inspection of the garage was unlawful even though Ms. Flores verbally consented to the search because the government did not determine whether she had authority to consent; 4) Ms. Flores' signed consent was tainted and involuntary because Detective Chio was already searching the garage when consent was obtained; and 5) Defendant's statements were taken in violation of his Fifth Amendment rights and were the product of numerous Fourth Amendment violations.

The government asserts 1) that Ms. Flores consented to Officer Koval's entry into the home; 2) that Officer Koval's protective sweep of the home was valid; 3) that all searches were conducted with valid consent from Ms. Flores; and 4) that even if Defendant's Fourth Amendment rights were violated, the inevitable discovery doctrine applies such that all gathered evidence is admissible.  Each argument will be discussed in turn.

A.    Initial Entry into the Home

The Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."[3]  "This protection takes on special meaning when the challenged intrusion

---

[3]U.S. Const. amend. IV.

involves the home: physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."[4]  However, warrantless entry and search of a home is permissible under the Fourth Amendment "when the police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained."[5]  Permission to enter can be either express or implied and is judged by an "objective reasonableness" standard.[6]  Silence, acquiescence and other non-verbal communication can be construed as consent, based on a totality of the circumstances evaluation.[7]

Both parties rely heavily on two cases, *United States v. Hernandez*[8] and *United States v. Ramirez-Chilel*,[9] to support their respective positions regarding Ms. Flores' consent, or lack thereof, to the initial entry of the home.  In *Hernandez*, the police knocked on the door of an apartment, requested permission to enter from the occupant who answered the door, and were asked to wait outside.  An officer stated that he could smell marijuana and asked again if they could enter.  A second occupant opened the door wide, both occupants stepped back, and the police entered.  The court found this behavior to be non-verbal consent to enter.  In *Ramirez-Chilel*, the court held that opening the door and stepping aside was properly interpreted by

---

[4]*U.S. v. McKerrell*, 491 F.3d 1221, 1225 (10th Cir. 2007) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984)).

[5]*Id*. (quoting *Georgia v. Randolph*, 547 U.S. 103, 106 (2006)).

[6]*U.S. v. Waupekenay*, 973 F.2d 1533, 1535 (10th Cir. 1992).

[7]*U.S. v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999).

[8]2007 WL 4210040 (D. Utah 2007).

[9]289 F.3d 744 (11th Cir. 2002).

officers as consent to enter.[10]

In this case, the Court finds that Ms. Flores' non-verbal actions were properly interpreted by Officer Koval as consent to enter the home.  Ms. Flores initially opened the door in response to Officer Koval's knock.  Officer Koval testified, and Defendant does not dispute, that after he asked to speak to the male occupants of the house, Ms. Flores "opened the door, turned around, and started walking into the house."[11]  She also stated, "That's fine."  Though she did not specifically invite the officers in, her non-verbal communication indicated to Officer Koval that he was free to enter because she opened the door further after Officer Koval asked to speak to the male occupants, and she did not protest when he followed her in.  Therefore, Officer Koval's initial entry into the home was lawful.

    B.    Officer Koval's sweep

Defendant next argues that Officer Koval's inspection of the home after the three male occupants were taken outside is improperly characterized as a protective sweep and that it was conducted without valid consent.

"A protective sweep is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others."[12]  The Tenth Circuit has held that "a protective[sweep is only valid when performed incident to an arrest[.]"[13]  However, as argued by the government, several circuits have declined to apply the incident-to-arrest condition as a

---

[10]*Id*. at 752.

[11]Def. Mem. in Supp. at 3 (Docket No. 196).

[12]*Maryland v. Buie*, 494 U.S. 325, 327 (1990).

[13]*United States v. Torres-Castro*, 470 F.3d 992, 997 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 2285 (2007).

bright line rule.[14]  Further, the Tenth Circuit's discussion in *United States v. Garza*[15] indicates that there may be situations in which the protective sweep doctrine may encompass "circumstances other than an officer's presence for purposes of making an arrest."[16]

In *Garza*, the Tenth Circuit examined whether an objectively reasonable belief of danger existed that would justify a protective sweep in the absence of an arrest.[17]  While the court ultimately determined that no reasonable belief of danger existed in that case, the court engaged in a lengthy evaluation of the facts, rather than disposing of the issue under a per se rule.[18]

In this case, the parties are in agreement that there was no arrest that night.  While the Tenth Circuit precedent is that a protective sweep is ordinarily not lawful unless performed incident to an arrest, this Court finds that this case presents the scenario anticipated by the Tenth Circuit in *Garza*, namely, there may be circumstances in which a protective sweep is lawful, an arrest would be counterproductive to an ongoing investigation, and would be unnecessarily intrusive on the rights of the defendant.  Further, the safety of the officers must be balanced against the Fourth Amendment rights of the defendant.  Officer Koval entered the home, in the dark, without his backup, otherwise engaged with the three male suspects.  The three males in the home, while all cooperative with Officer Koval's requests, presented the possibility that there might be other men in the home.  Based upon the Pirates Cove and Mulcahy calls, the statements

---

[14]Resp. to Reply at 5 n.1 (Docket No. 209) (collecting cases).

[15]125 Fed. Appx. 927 (10th Cir. 2005).

[16]*Id*. at 931.

[17]*Id*.

[18]*Id*. at 931-933.

of the neighbors, and his training and experience, Officer Koval believed the house could be part

of an auto theft ring, which as a felony crime, presented the possibility of violence.  Officer

Koval conducted the sweep in about two minutes and limited it to places where a person may be

hiding.  Further, based on the events that transpired subsequent to the sweep, Officer Koval had

probable cause to make an arrest but did not do so.  In light of the practical impact of arresting

someone who could be more helpful without an arrest, the Court finds that strict application of a

bright line rule is not warranted.   The Court finds that Officer Koval's protective sweep of the

house and garage was lawful, though it was not incident to an arrest.  However, even if the Court

were to find that the sweep was unlawful, this is not dispositive, as discussed below.

        C.        Garage searches

Defendant argues that Officer Koval did not ascertain whether Ms. Flores had authority to

consent to a search of the garage and that the ensuing search was therefore unlawful.  Defendant

further argues that any purported consent was the product of acquiescence to authority, rather

than voluntary and knowing consent.  Defendant further argues that because Officer Koval

entered the house unlawfully, all subsequent searches were violations of Defendant's Fourth

Amendment rights and the resulting evidence is therefore inadmissible.

        1.        Consent to Search

Under the Fourth Amendment, "a search conducted without a warrant issued upon

probable cause is per se unreasonable . . . subject only to a few specifically established and well-

delineated exceptions."[19]  "Consensual searches constitute one exception to the warrant

---

[19]*Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (internal quotations omitted).

requirement."[20]  Consent may be obtained from an individual possessing either actual or apparent

authority to consent.[21]  The Tenth Circuit has established "the following standards for assessing

actual authority to consent to a search of the residence: (1) mutual use of the property by virtue

of joint access, *or* (2) control for most purposes over it."[22]  Apparent authority requires an

objective evaluation of what facts were available to the searching officer at the time the search

occurred, and whether the officer has a reasonable belief that the consenting party had actual

authority to do so.[23]

In this case, the Court finds that Ms. Flores had authority to consent to a search because

she demonstrated mutual use of the property by virtue of joint access.  She answered the door

when Officer Koval rang the doorbell at 3 a.m.  She stated that she was Defendant's girlfriend

and that she and her young child lived there, along with Defendant.  She indicated that she knew

the auto parts were in the garage.  All of these facts were known to Officer Koval prior to his

request for verbal consent to search the garage.  Thus, Ms. Flores had actual authority to consent.

Further, Officer Koval had a reasonable belief that Ms. Flores had actual authority, based

on her statements to him, her presence in the home, her child's presence in the home, her

knowledge of the auto parts in the garage, her willingness to consent to a search, and the fact that

she opened the garage door and turned on the light for Officer Koval  Thus, based on the facts

known to Officer Koval at the time he asked if he could search the garage, he had a reasonable

---

[20]*United States v. Cos*, 498 F.3d 1115, 1124 (10th Cir. 2007).

[21]*Id*.

[22]*Id*. at 1125 (quoting *United States v. Rith*, 164 F.3d 1323, 1329 (10th Cir. 1999) (internal quotations omitted)).

[23]*Id*. at 1128.

belief that Ms. Flores had actual authority to consent to a search.

### 2.    Acquiescence to Authority

"[V]alidity of consent to search requires a factual determination based upon the totality of the circumstances of whether the consent was the product of an "essentially free and unrestrained choice . . . or whether it was the product of duress or coercion, express or implied."[24]  "Factors to consider within the federal totality of the circumstances test include physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons."[25]

In this case, there is no evidence that Officer Koval threatened, touched, or otherwise mistreated Ms. Flores.  He was the only officer in the house when he asked Ms. Flores for consent to search.  While he was in uniform and was armed, there is no evidence that he brandished his weapon or otherwise coerced Ms. Flores into consenting to the search.  Officer Koval testified that he asked Ms. Flores if he could search the garage and she responded, "that's fine," before opening the garage door and turning on the light for him.  The Court finds that Ms. Flores' consent was knowingly and voluntarily given and was not the product of coercion or duress.

### 3.    Consent after Protective Sweep

"When a consensual search is preceded by a Fourth Amendment violation . . . the government must prove not only the voluntariness of the consent under the totality of the

---

[24]*United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006) (quoting *Schneckloth*, 412 U.S. at 225, 227) (internal quotations omitted).

[25]*Id.*

circumstances, [but also] must establish a break in the causal connection between the illegality and the evidence thereby obtained."[26]

In this case, as discussed above, the initial sweep of the home, including Officer Koval's initial inspection of the garage was lawful.  Further, Ms. Flores' verbal consent to search the garage was valid.  Thus, the Court finds that because the initial sweep was lawful and did not violate Defendant's Fourth Amendment rights, the subsequent garage searches were not tainted by any illegality flowing from the protective sweep.

With respect to the subsequent searches, the same reasoning outlined above applies.  Ms. Flores, with actual and apparent authority, signed a consent-to-search form that listed the auto parts in the garage as the subject of the search.  Prior to signing the form, Ms. Flores provided more evidence that she had authority to consent in the form of mail and a citation with her name and the 8341 Mulcahy address listed as her place of residence and reiterating that she and her child lived there.  Thus, the subsequent searches of the garage were conducted with valid verbal and written consent from Ms. Flores and the evidence gathered therein will not be suppressed.

Even if the Court were to find that the initial protective sweep was unlawful, the subsequent searches were lawful pursuant to Ms. Flores' consent.  Assuming the initial search was unlawful, the issue is whether there was a break in the causal connection between the illegality of the initial inspection and the evidence that was later discovered by the more thorough inspections of the garage that were conducted after Ms. Flores' verbal, and ultimately written, consent.

---

[26]*United States v. Melendez-Garcia*, 28 F.3d 1046, 1053 (10th Cir. 1994).

14

In *Brown v. Illinois*,[27] the Supreme Court "provided three factors that are especially relevant to determining whether a consent is tainted by a preceding illegal search or seizure: 1) the temporal proximity between the police illegality and the consent to search; 2) the presence of intervening circumstances; and particularly 3) the purpose and flagrancy of the official misconduct."[28]  "[T]he 'purpose and flagrancy' prong of the *Brown* test can only be aimed at exploring whether the police have exploited their illegal search."[29]

Here, the request for consent to search the garage came directly after Officer Koval's sweep of the house.  There is no evidence of intervening circumstances that would "purge the primary taint"[30] of the initial sweep.  However, the Court finds that Officer Koval did not exploit the illegal inspection of the garage in requesting consent to further search.  Officer Koval conducted the sweep with the intent of securing the house, as evidenced by his testimony that he confined his search to places where people could hide and that his inspection of several bedrooms, a bathroom and the garage took less than two minutes.  Assuming this initial inspection ultimately turned out to be unlawful, Officer Koval conducted it in good faith.  Further, there is no evidence that Officer Koval made any statements to Ms. Flores that could be construed as exploitative.  He already suspected that this residence may be a chop shop, but did not carefully inspect any of the auto parts until after obtaining consent.  Defendant was read his *Miranda* rights and given an opportunity to explain the auto parts in the garage prior to Officer

---

[27]422 U.S. 590 (1975).

[28]*Melendez-Garcia*, 28 F.3d at 1054.

[29]*Id*. at 1055.

[30]*Wong Sun v. United States*, 371 U.S. 471, 486 (1963).

15

Koval's request of Ms. Flores for consent.  Defendant's explanation for the parts only added to

Officer Koval's suspicions of a chop shop.  Details such as the absence of VINs on the parts and

the discovery of an ATV in the garage were only discovered after consent was given.

Therefore, the Court finds that the initial sweep was lawful, but that even if it was not, the

subsequent searches were conducted with valid consent and did not exploit any illegality arising

from the initial inspection.

          D.       Inevitable Discovery Doctrine

In its opposition brief, the government contends that the inevitable discovery doctrine

allows for the admittance of the evidence obtained in the searches of the garage.  Defendant

argues that Officer Koval did not have probable cause to search and that the government has not

met its burden in showing that a warrant would likely have been obtained.

"The inevitable discovery exception applies whenever an independent investigation

inevitably would have led to discovery of the evidence, whether or not the investigation was

ongoing at the time of the illegal police conduct."[31]  The exception "does not apply in situations

where the government's only argument is that it had probable cause for the search, . . . [but] may

apply where, in addition to the existence of probable cause, the police had taken steps to obtain a

search warrant."[32]

As previously discussed, Officer Koval had probable cause for the search.  His suspicions

began forming long before the protective sweep and the garage searches.  However, the

government does not put forth any evidence that steps were taken to obtain a warrant, arguing

---

[31]*United States v. Souza*, 223 F.3d 1197, 1203 (10th Cir. 2000) (quoting *United States v. Larsen*, 127 F.3d 984, 986 (10th Cir. 1997)) (internal quotations omitted).

[32]*Id*.

only that probable cause existed such that one *could* have been obtained.  In light of Tenth

Circuit law, this does not support a finding by this Court that the inevitable discovery exception

applies.  However, because this Court finds that the garage searches were conducted with the

consent of Ms. Flores, the inevitable discovery exception need not be invoked.

E.     Defendant's Statements

Defendant next argues that the statements he made to Officer Chio should be suppressed

because his statements were taken in violation of his Fifth Amendment rights and the

requirements of *Miranda v. Arizona*.[33]

"[A]ny confession obtained during a custodial interrogation may not be used by the

prosecution against the defendant unless the prosecution demonstrates the use of procedural

safeguards effective to secure the Fifth Amendment privilege against self-incrimination."[34]

Officer Koval gave Defendant his *Miranda* warnings at 3:16 a.m., nearly two hours prior

to the 20-25 minute conversation between Defendant and Officer Chio, which took place at about

5 a.m., while sitting on a wall across the street in front of a neighbor's home.  Defendant also

completed a *Miranda* statement form at about 5 a.m., indicating that he received and understood

his rights and that he voluntarily waived them.  Officer Koval signed his own name as a witness

to that form.  There is no evidence of coercion or any indication that Defendant did not, in fact,

understand and knowingly waive his rights.  Thus, the Court finds that Defendant was properly

informed of his *Miranda* rights, that he knowingly and voluntarily waived them, and that the

resulting statements were not taken in violation of his Fifth Amendment rights.  Therefore, his

---

[33]384 U.S. 436 (1966).

[34]*U.S. v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008) (citing *Miranda*, 384 U.S. at 444).

statements will not be suppressed.

    IV.    Conclusion

Based on the reasoning above, the initial entry into Defendant's home was lawful, as was the initial sweep of the home.  Further, Officer Koval conducted the searches of the garage pursuant to the verbal and written consent of Ms. Flores and Defendant was properly informed of his *Miranda* rights.  Even if the Court were to find that the initial sweep of the home was not within the scope of a lawful protective sweep, Officer Koval did not exploit the evidence gathered in that search such that all subsequent searches are tainted.  It is therefore

ORDERED that Defendant's Motion to Suppress (Docket No. 173) is DENIED.  It is further

ORDERED that Defendant's Motion to Strike (Docket No. 210) is DENIED AS MOOT.

DATED   May 19, 2008.

BY THE COURT:

_____
TED STEWART
United States District Judge